UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DOUGLAS CAMPBELL, d/b/a
CAMPBELL ENVIRONMENTAL
SYSTEMS,

                           Plaintiff,

        v.                                                        **DECISION AND ORDER**
                                                                  02-CV-651S

AUSTIN AIR SYSTEMS, LTD.,

                           Defendant.

# I.  INTRODUCTION

In this case, Plaintiff Douglas Campbell d/b/a Campbell Environmental Systems ("Campbell"), a distributor of air cleaners, alleges that Defendant Austin Air Systems, Ltd. ("Austin"), a manufacturer of air cleaners, engaged in price fixing, terminated his distributorship, discriminated between distributors with respect to pricing, tortiously interfered with his customer contracts, and breached the terms of its own distributorship agreement.  Plaintiff seeks relief under federal anti-trust law as well as New York law. Currently before this Court is Defendant's Motion for Summary Judgment on Plaintiff's claims and on its own counterclaim for unpaid invoices.

# II.  BACKGROUND

## A.    Factual Summary

The following facts are undisputed for purposes of the instant motion, except where indicated.  Defendant Austin manufactures portable air cleaners and filters, and sells these products principally through non-exclusive dealers.  (Defendant's Rule 56 Statement of

Undisputed Material Facts ("Def.'s State."),[1] ¶¶ 4, 5).  Plaintiff Campbell acted for several

years without a contract as a distributor of Austin Air Cleaners until 2002.  (Def.'s State.,

¶¶ 21, 22).  On March 25, 2002, Plaintiff signed a written Authorized Dealership Agreement

("Agreement") with Austin.  (Def.'s State., ¶¶ 22, 23).  The Agreement explicitly states that

dealers could sell Austin Air Cleaners for any price.  (Def.'s State., ¶ 26; Domon Aff., Exh.

A, ¶ 3(f)).[2]   Moreover, the Agreement provides that either Austin or the dealer may

terminate the Agreement at any time, with or without cause, upon seven days prior notice

to the other party.  (Def.'s State., ¶ 28; Domon Aff., Exh. A, ¶ 6(e)).

With respect to promotion or advertisement of Austin products on the Internet, the

Agreement requires that the dealer submit its proposed Internet page or any modification

to its existing page to Austin for approval.  (Def.'s State., ¶ 27; Domon Aff., Exh. A, ¶ 4(a),

(c)).  Most significantly, the Agreement states that "any Internet advertising of Products

must show the price [the] Dealer is selling for[, and this] pricing must be the same or higher

than Austin's Advertising Price Schedule as it may be amended from time to time."  (Def.'s

State., ¶ 27; Domon Aff., Exh. A, ¶ 4(f)).  Austin initiated this Advertising Price Schedule

for the Internet, a species of minimum advertising pricing ("MAP"), after Campbell

suggested it in a September 13, 2001 e-mail to Austin's President Richard Taylor

("Taylor").  (Def.'s State., ¶¶ 10-14; Appendix to Def.'s State. ("App."), Ex. A).  The e-mail,

sent under the subject line "Austin Air Lowball Internet Advertisers," apprised Taylor that

marketers were advertising prices on the Internet that were lower than the retail price.

---

[1] Rule 56.1(c) of the Local Rules of Civil Procedure for the Western District of New York provides that facts contained in the moving party's Rule 56 Statement are deemed admitted unless controverted by the opposing party.

[2] The Affidavits of Gerald T. Walsh, Richard Taylor, Michael Domon, and Roberts Mahaney are attached to Defendant's Motion for Summary Judgment.  (Docket No. 37).

2

(Def.'s State., ¶¶ 10-11; Campbell Dep., p. 22-23 (attached as Ex. B to App.); App., Ex. A). Campbell attached to his e-mail examples of web pages from other marketers and complained that replacement filters were being advertised for "far less than what they should be sold for."  (Def.'s State., ¶¶ 11-13, Campbell Dep., pp. 25-27; App, Ex. A). According to Campbell's e-mail, his advertising costs had gone up and his sales had dropped since a new Internet software was introduced which allowed companies to outbid other companies for favorable placement on an Internet search engine.  (Def.'s State., ¶ 12; Campbell Dep., p. 23-25; App., Ex. A).  Campbell stated to Taylor that MAP was the proven "way to go," based on his prior experience as a consultant for Miele Vacuum. (Def.'s State., ¶ 14, Campbell Dep., pp. 28-29; App, Ex. A).  Campbell suggested that other Austin distributors should be suspended until they complied with the MAP policy, and stated that "the minute you start suspending a few distributorships and halting shipment, they will listen - - THEY WILL LISTEN!"  (Def.'s State., ¶ 15, Campbell Dep., p. 30; App., Ex. A).

At his deposition, Campbell acknowledged the difference between MAP, the minimum price for which a dealer may advertise, and the actual price for which a dealer could actually sell a product.  (Def.'s State., ¶ 16, Campbell Dep., pp. 30-31).  Further, Campbell opined that the sales process only becomes competitive after a consumer contacts the distributor for a price.  (Def.'s State., ¶ 17, Campbell Dep., pp. 31-32).

According to his deposition testimony, Campbell voiced concerns in the fall of 2001 about new credit policies implemented by Robert Mahaney, Austin's comptroller.  (Def.'s State., ¶ 18, Campbell Dep., pp. 46-54).  Mahaney testified that Austin initially extended Campbell a $25,000 line of credit.  (Def.'s State., ¶ 19, Mahaney Dep., p. 35 (attached as Ex. D to Aff.)).  Austin eventually increased Campbell's credit limit to $35,000.  (Def.'s

State., ¶ 19, Mahaney Dep., p. 35).  According to Austin, its distributors, including Mr. Campbell, were charged set list prices, which were raised across the board in 2002. (Def.'s State., ¶ 20).  However, according to the sworn affidavit of Heather Peterson, a former Austin employee, Austin only raised the unit prices for a handful of distributors, including Campbell.  (Peterson Aff., ¶ 9).[3]

Austin unilaterally terminated its Agreement with Campbell on June 17, 2002. (Def.'s State., ¶ 29; Doman Aff., Exs. A, B).  Austin alleges that it was forced to terminate Campbell as a dealer because he refused to comply with Austin's Internet advertising policy.  (Taylor Aff., ¶ 18).  For example, Austin alleges that Campbell's Internet advertisement claimed the "lowest prices," without specifying Austin's list price.  (Taylor, 15, 18).  Austin contends that when he was confronted, Campbell initially added the list price to his website, but subsequently deleted the price after Austin confirmed that the site was in compliance.  (Taylor Aff., ¶¶ 15, 18).

Campbell disputes Austin's contention that he was terminated for refusing to comply with Austin's Internet MAP policy.  (Pl.'s State., ¶¶ 9-14).  Rather, Campbell claims that his problems with Austin began in September of 2001 when he sold deeply discounted air filter systems to victims of the 9/11 tragedy in New York City.  (Campbell Aff., ¶ 7).  Campbell

---

[3]Defendant argues that Ms. Peterson's affidavit should be disregarded because it contradicts her prior deposition testimony.   The Second Circuit has held that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  Hayes v. New York City Dept. of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  The reasoning behind this rule is straightforward – "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  Id.  While this Court agrees that Ms. Peterson's affidavit does contradict her deposition testimony with respect to shipping and back orders, and the incidence of complaints made by Campbell's customers compared with other customers, Austin has cited to no such inconsistency with respect to unit pricing.  Accordingly, this Court finds that the issue of whether Austin raised unit prices across the board is a disputed fact.

contends that his competing distributors complained to Austin about the discounts he was providing.  (Campbell Aff., ¶ 8).  He alleges that in response to these complaints, Austin purposefully delayed the shipment of his orders to benefit other distributors, shipped Campbell's customers damaged units and units containing refurbished motors, and delayed shipment of replacement units.  (Pl.'s State., ¶¶ 4-8).  With respect to these disputed allegations, Campbell argues that "it cannot be any coincidence that at the same time my competitors were complaining to defendant that I was discounting my prices to my customers, my customers began receiving defective units at a very high percentage rate of all units shipped."  (Campbell Aff., ¶ 14).  Austin contends that pursuant to its unconditional money back guarantee, any customer who complained about a unit was issued a new unit or a refund.  (Def.'s State., ¶¶ 32, 38; Taylor Aff., ¶ 25).

The facts as they relate to Austin's counterclaim for unpaid invoices are as follows. At the time of his termination, Austin had 86 invoices for goods shipped to Campbell's customers with invoice dates from May 17, 2002, through June 11, 2002, totaling $23,597.24.  (Def.'s State., ¶ 30; Mahaney Aff., Ex. C).  Campbell alleges that at the time of his termination, orders had been placed with Austin that were not shipped.  (Pl.'s State., ¶ 3).  Although Campbell complained about the accuracy of his account balance, Austin contends that it applied every payment received from Campbell to his account.  (Def.'s State., ¶ 31, Mahaney Dep., pp. 22-26).

## B.    Procedural History

Plaintiff commenced this lawsuit on September 6, 2002, by filing a Complaint in the United States District Court for the Western District of New York.  Defendant filed its Answer and a Counterclaim against Plaintiff on November 21, 2002.  On January 14, 2005, Defendant filed the instant Motion for Summary Judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure.[4]  This Court heard oral argument on April 8, 2005, and reserved decision at that time.

## III.  DISCUSSION

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  Ultimately, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

---

[4]In support of its Motion for Summary Judgment, Defendant filed a memorandum of law, affidavits by Gerald T. Walsh, Richard Taylor, Michael Domon, and Roberts Mahaney with exhibits,  a Local Rule 56 statement with an appendix thereto, a reply memorandum of law, and a second affidavit by Gerald T. Walsh with exhibits.  Plaintiff filed a memorandum of law, affidavits by Douglas Campbell and Heather Peterson, and a Local Rule 56 statement with exhibits in opposition to the Motion.

**B.     Defendant's Motion for Summary Judgment**

Plaintiff asserts six causes of action against Defendant.  In the first cause of action, Plaintiff alleges that Defendant engaged in price fixing and terminated his distributorship in violation of the Sherman Act and the Clayton Act.  Plaintiff's second cause of action asserts that Defendant violated the antitrust laws by fixing and maintaining prices on its air cleaner products.  In his third cause of action, Plaintiff contends that Defendant engaged in price discrimination in violation of the Robinson-Patman Act.  Plaintiff's fourth cause of action alleges that Defendant attempted to force him out of business in violation of the Hobbs Act.  In his fifth and sixth causes of action, Plaintiff alleges that Defendant tortiously interfered with his consumer contracts and breached its own distributorship agreement. In its counterclaim against Plaintiff, Defendant seeks to recover unpaid invoices.  This Court will address each cause of action in turn.

**1.     The Sherman Act**

Campbell claims that Austin terminated its distributorship in response to complaints from his competitors that he was selling deeply discounted Austin products.[5]   He alleges that Austin's conduct constitutes a violation of Section 1 of the Sherman Act.  Section 1 of the Sherman Act ("Section 1") declares illegal "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations." 15 U.S.C.A. § 1.  There are "very specific rules which make summary judgment . . . available to dismiss claims of antitrust conspiracy in violation of [Section 1 of the] Sherman Act."  <u>H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys.,</u>

---

[5] Specifically, Campbell argues that in response to his competitor's complaints, Austin employed unduly aggressive tactics in an effort to coerce him to adhere to a favorite pricing policy.  Campbell disputes Austin's contention that it terminated him because he failed to comply with Austin's Internet MAP policy.  He contends that Austin fired him for *selling* Austin products for below the suggested retail price rather than for *advertising* or failing to advertise at or above Austin's Advertising Price Schedule.

Inc., 879 F.2d 1005, 1012 (2d Cir. 1989).   To establish a violation of Section 1 in a distributor-termination case, a plaintiff must show concerted action between the manufacturer and other distributors.   15 U.S.C.A. § 1; Schwimmer v. Sony Corp. of Amer., 677 F.2d 946, 952 (2d Cir. 1982) (stating that "[o]ther elements aside, . . . the essence of a [Section 1] violation is a combination or agreement between two or more persons").   The law is clear that independent action on the part of a manufacturer is not proscribed under the Sherman Act.   Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F2d 919, 923 (2d Cir 1985).   Rather, "a manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."   Id. (internal citations omitted); United States v. Colgate & Co., 250 U.S. 300, 307, 39 S. Ct. 465, 468, 63 L. Ed. 992 (1919)).

The leading case on Section 1 conspiracy claims, Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 760-761, 104 S. Ct. 1464, 1469, 79 L. Ed. 2d 775 (1984), involved a terminated distributor of agricultural herbicides who alleged that a manufacturer and other distributors conspired to fix resale prices and to terminate Plaintiff's distributorship in furtherance of the conspiracy.   Therein, the Court held that a plaintiff asserting a Section 1 conspiracy must present "evidence that tends to exclude the possibility of independent action by the manufacturer and distributor" in order to survive a motion for summary judgment.   Monsanto, 465 U.S. at 768.   "That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective," or the claim will not survive.   Monsanto, 465 U.S. at 768.

The Monstanto Court recognized that any Section 1 claim involving distributor

termination implicates the right of a manufacturer to choose the distributors with whom it does business.   Under the doctrine articulated by the Supreme Court in <u>Colgate</u>, a manufacturer has the right: (1) to deal or refuse to deal with whomever it chooses; and (2) "to announce in advance the circumstances under which it will refuse to sell," so long as it does so independently.   <u>Colgate</u>, 250 U.S. at 307; <u>Hayden</u>, 879 F.2d at 1013 n.5.  To protect against erosion of this principle,[6] the <u>Monsanto</u> Court explicitly held that evidence of complaints by distributors, standing alone, does not support an inference of antitrust conspiracy.   <u>Mansanto</u>, 465 U.S. at 764; <u>see</u> <u>also</u> <u>Hayden</u>, 879 F.2d at 1013-14.   The Court reasoned that complaints about price cutters "are natural--and from the manufacturer's perspective, unavoidable--reactions by distributors to the activities of their rivals," which "arise in the normal course of business and do not indicate illegal concerted

---

[6]With respect to the <u>Colgate</u> doctrine, the <u>Monsanto</u> Court held that:

> On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in *Sylvania* and *Colgate* will be seriously eroded.

<u>Monsanto</u>, 465 U.S. at 763.  The <u>Sylvania</u> doctrine states that a court may not construe a non-price restriction imposed by a manufacturer on a distributor as illegal per se; rather, the restriction is to be judged under the "rule of reason."  <u>Continental T.V. Inc. v. GTE Sylvania, Inc.</u>, 433 U.S. 36, 49-50, 97 S. Ct. 2549, 2557, 53 L. Ed. 2d 568 (1977).  Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  Id.; <u>see</u> also <u>Business Electronics Corp. v. Sharp Electronics Corp.</u>, 485 U.S. 717, 735-36, 108 S. Ct. 1515, 1525, 99 L. Ed. 2d 808 (1988) (holding that even when an anti-trust plaintiff can prove a vertical agreement between a manufacturer and a full price dealer to terminate a competing price-cutting dealership, the agreement is not per se illegal under Section 1 of the Sherman Act, unless the plaintiff also offers proof of an agreement by the full price dealer to set its price at some level).  In the instant case, Campbell disputes that he was terminated for violating Austin's Internet MAP policy set forth in the Agreement.  Rather, he contends that the conspiracy between Austin and his competitors to fix prices *existed outside of the Agreement*.  As such, this Court's analysis does not focus on the Agreement itself.

For the record, however, this Court finds that the Agreement does not impose an unreasonable restraint on competition under the "rule of reason" set forth in <u>Sylvania</u>.  433 US at 57-59.  By its plain language, Austin's Internet MAP policy restricts only the minimum  price for which a dealer could advertise on the Internet.  (<u>Domon Aff.</u>, Exh. A, ¶ 4(f)).  With respect to actual sales pricing, the Agreement explicitly states that a dealer may sell Austin Air Cleaners for any price.  (<u>Domon Aff.</u>, Exh. A, ¶ 3(f)).  As such, this Court finds that the Agreement itself does not violate Section 1 of the Sherman Act, nor does it constitute proof of a vertical agreement to fix prices.

action."  Monsanto, 465 U.S. at 763 (internal citations omitted).  Accordingly, it cautioned

that barring a manufacturer from acting "solely because the information upon which it acts

originated as a price complaint would create an irrational dislocation in the market."

Monsanto, 465 U.S. at 763.  Further, it warned that "[p]ermitting an [illegal] agreement to

be inferred merely from the existence of complaints, or even from the fact that termination

came about 'in response to' complaints, could deter or penalize perfectly legitimate

conduct," "inhibit management's exercise of independent business judgment," and

"emasculate the terms of the [Sherman Act]."  Monsanto, 465 U.S. at 763-64 (internal

citations omitted); see also Schwimmer, 677 F.2d at 953.

       In the instant case, Campbell claims that unnamed competitors complained to

Austin that he was price cutting, and that in response, Austin raised his list prices, sent

damaged or substandard units to his customers in an untimely fashion and eventually

terminated his distributorship.  Construing the record in a light most favorable to Plaintiff,

as it must, this Court finds that there is no direct or circumstantial evidence which

reasonably tends to prove that Austin and Campbell's competitors shared a "conscious

commitment" to a "common scheme" designed to fix prices.[7]  The law is clear that this

Court may not infer an illegal conspiracy from evidence that Campbell's competitors

complained that he was selling Austin air filters at deeply discounted prices.  Monsanto,

465 U.S. at 764.  Competitor complaints have been characterized as highly ambiguous

_____

       [7]Plaintiff makes reference to a phone message left by Austin's representative Dan Block, in which
he allegedly threatened to suspend Campbell if he did not comply with the suggested retail price.
However, Plaintiff has not produced this tape and his allegations regarding the substance of the tape are
contradicted by Mr. Block's sworn testimony that he told Campbell that he could sell the products for
"whatever he wanted to," but he had to comply with Austin's MAP policy.  (Block Dep., pp. 15-16 (attached
as Ex. B to second Walsh Aff.).  It is well settled that a reviewing court is only required to consider
admissible evidence in ruling on a motion for summary judgment.  Nora Beverages v. Perrier Group of
Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  Accordingly, this Court declines to consider Plaintiff's
unsubstantiated (and disputed) allegations regarding the substance of Mr. Block's phone message.

10

evidence of antitrust conspiracy, <u>Monsanto</u>, 465 U.S. at 764, and it is well settled that "antitrust law limits the range of permissible inferences from ambiguous evidence in a [Section 1] case." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d  538 (1986) (stating that conduct which is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy).

Based on the foregoing, this Court finds that no reasonable trier of fact could conclude that Austin entered into a common scheme with Campbell's competitors to fix prices.  Campbell has failed to present any evidence in opposition to summary judgment that tends to exclude the possibility that Austin acted independently.  <u>Monsanto</u>, 465 U.S. at 768.  Further, this Court finds that Campbell's allegation that Austin terminated his distributorship in response to the complaints of his competitors is legally insufficient to infer concerted action required under Section 1 of the Sherman Act.  Accordingly, Campbell's Sherman Act claim must be dismissed.

## 2.    Clayton Act

In his first cause of action, Plaintiff also invokes Section 3 of the Clayton Act, 15 U.S.C. § 14.  However, Campbell does not allege how Austin's alleged conduct violates this provision of the antitrust laws.  Section 3 of the Clayton Act provides, in pertinent part, that "[i]t shall be unlawful for any person . . . to . . . make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors . . . where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce."  15 U.S.C. § 14.  "[T]he gravamen of [any] Section 3 violation is the forbidden

condition, agreement or understanding of exclusivity, and a proper pleading should assert this ultimate fact." McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 338 (4th Cir. 1959).

Among other things, Section 3 provides a cause of action for anti-competitive "product tying" and "exclusive dealing" arrangements. See Bennett v. Cardinal Health Marmac Distrib., Inc., No. 02 CV3095 (JG), 2003 WL 21738604, at *5 -6 (E.D.N.Y. July 14,2003). To establish an illegal "tying" arrangement, a buyer must demonstrate, among other things, that a defendant tied the sale of two distinct products; in other words, that it sold one product on the condition that another be purchased as well. See In re Visa Check/Master Money Antitrust Litigation, 280 F.3d 124, 133 n. 5 (2d Cir. 2001). To prove an illegal exclusive dealing arrangement, a plaintiff must demonstrate that a manufacturer designated a single distributor as the sole outlet for their products in a particular geographic area. See, Bennett, 2003 WL 21738604, at *5 -6.

Viewing the record as a whole, this Court finds that Campbell has presented no evidence from which a reasonable juror could infer that Austin entered into an agreement or understanding of exclusivity, such as a product tying or exclusive dealing arrangement. Accordingly, Plaintiff's claim under Section 3 of the Clayton Act will be dismissed.

### 3.    Price Fixing and Maintenance

Plaintiff's second claim alleging price fixing and maintenance is duplicative of his first cause of action. As previously discussed herein, evidence that Campbell terminated Austin in response to the complaints of Austin's competitors is legally insufficient to establish price fixing. Because competitors' complaints are wholly consistent with permissible competition, they cannot, standing alone, support an inference of antitrust

conspiracy.  Mansanto, 465 U.S. at 764; see also Hayden, 879 F.2d at 1013-14.  For the reasons set forth above, this Court finds that the evidence provided by Campbell in support of this price fixing and maintenance claim is insufficient to withstand summary judgment. Accordingly, Plaintiff's cause of action for price fixing will be dismissed.

### 4.    Price Discrimination Under the Robinson-Patman Act

In his third cause of action, Plaintiff claims that Defendant discriminated between distributors with respect to pricing in violation of Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13.  Section 2, provides in pertinent part, that "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly."  15 U.S.C. § 13. Thus, the act prohibits a seller from engaging in price discrimination that is likely to result in competitive injury.  For the purposes of this Section, "price discrimination means nothing more than a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade and quality."  Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 584 (2d Cir. 1987).  By its terms, Section 2 is a "prophylactic statute which is violated merely upon a showing that the effect of such discrimination *may be* substantially to lessen competition."  J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 561-62, 101 S. Ct. 1923, 1927, 68 L. Ed. 2d 442 (1981).

In turn, Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue

therefor in any district court of the United States . . . , and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.   In comparison to Section 2, Section 4 of the Clayton Act is essentially a remedial statute, which provides treble damages to a party who is in fact injured by conduct forbidden by the antitrust laws.  J. Truett, 451 U.S. at 561-62.  Therefore, to recover treble damages "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent."  J. Truett, 451 U.S. at 561-62; see also Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S. Ct. 1871, 1874, 23 L. Ed. 2d 599 (1969) (holding that a plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered").

This Court finds that a genuine issue of fact exists with respect to whether Austin discriminated against Campbell in regards to pricing.  That is, there is some dispute as to whether Austin  raised its list prices between 2001 and 2002 across the board, or if Austin raised its unit prices for only a "handful" of dealers including Campbell, as Ms. Peterson, Austin's former employee stated in her sworn affidavit.  (Peterson Aff., ¶ 9).  However, this fact is only a material one  if Plaintiff has presented sufficient evidence to show that he was injured because of this alleged price discrimination.  As evidence of injury, Campbell cites to his Schedule C tax returns for the years 2000 through 2002.  (Mahaney Aff., Ex. B).  These returns reflect a net profit of $9,703.00 in 2000, $24,252.00 in 2001, and $14,054.00 in 2002.  (Mahaney Aff., Ex. B).  Further, Campbell alleges that since he was terminated by Austin, a manufacturer that dominates the residential air cleaner market, he has become associated with a much smaller company known as Aller Air.  (Campbell Dep., ¶¶ 19-21).  Moreover, he alleges "that those dealers who were complaining directly benefitted

14

and profited from my termination by the decrease in competition." (<u>Campbell Aff.</u>, ¶ 29).

However, in producing this "evidence," Campbell misapprehends what is necessary to prove a price discrimination claim under the Robinson-Patman Act.  Under the Act, a plaintiff is required to establish some connection between the alleged price discrimination and injuries to the plaintiff in the form of lost sales or profits.  <u>Hayden</u>, 879 F.2d at 1022. Campbell's losses resulting from his termination and the effect of his termination on his unnamed competitors is not relevant to this inquiry.  The only relevant evidence presented are Campbell's Schedule C tax returns, which demonstrate that Campbell's net profits varied between 2000 and 2001, and again between 2001 and 2002.  These records reflect that Campbell did experience a decrease in profits from 2001 to 2002.  However, this evidence, standing alone and without explanation, is insufficient to suggest a causal connection between Austin's alleged price discrimination and his losses.  That is, no reasonable fact-finder could determine from Campbell's lump sum profit figure that his losses in 2002 are attributable to an increase in Austin's list prices.  In the view of this Court, Campbell has failed to present a sufficient breakdown of his financial figures for such an inference to be reasonably drawn from the evidence.[8]

For example, without a fundamental breakdown of the approximate number of units sold or the price comparisons per unit sold during the relevant years, no fact-finder could reasonably determine that Austin's alleged price discrimination caused Campbell's losses. This Court notes that Campbell's alleged losses in 2002 are easily attributable to the

---

[8]Moreover, it is not this Court's duty or function to search the record in support of a litigant's suggested arguments.  <u>See</u> <u>Amnesty Am. v. Town of West Hartford</u>, 288 F.3d 467, 470 (2d Cir. 2002) ("[Rule 56] does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); <u>Smith v. Ward Leonard Elec. Co., Inc.</u>, No. 00 Civ. 3703, 2004 WL 1661098, at *3 n.2 (S.D.N.Y. July 23, 2004) ("It is the job of Plaintiff's counsel, not the Court, to identify evidence sufficient to avoid summary judgment.").

termination of his distributorship in June, halfway through the sales year, or any number of other factors unrelated to Austin's alleged price discrimination.  Based on Campbell's figures, his 2002 sales likely could have eclipsed his 2001 sales had his distributorship not been terminated.  However, Campbell's alleged losses, which have not been connected in any way to Austin's alleged discriminatory price increases, are insufficient to establish a violation of the Robinson-Patman Act.  Based on the foregoing, this Court finds that Campbell has failed to demonstrate a causal connection between the alleged price discrimination and his alleged injury sufficient to survive summary judgment.  See Truett, 451 U.S. at 562.   Accordingly, Plaintiff's Robinson-Patman claim will be dismissed.

5.      **Private Causes of Action Under the Hobbs Act**

Plaintiff's fourth cause of action alleges that Defendant attempted to force him out of business in violation of the Hobbs Act.  However, federal courts have consistently found that the Hobbs Act does not support a private cause of action. See, e.g., Barge v. Apple Computer, No. 95 Civ. 9715 (KMW), 1997 WL 394935, at *2 (S.D.N.Y. July 15, 1997); John's Insulation Inc. v. Siska Constr. Co., 774 F. Supp. 156, 163 (S.D.N.Y.1991); see also Bajorat v. Columbia-Breckenridge Dev. Corp., 944 F. Supp. 1371, 1377-78 (N.D.Ill.1996) (collecting cases holding that the Hobbs Act and other criminal statutes do not allow for a private right of action).  When questioned at oral argument, Plaintiff's counsel conceded that his private cause of action under the Hobbs Act could not be maintained.  Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's Hobbs Act claim.

6.      **Plaintiff's State Law Claims for Tortious Interference with Contracts, and Breach of Contract and Defendant's Counterclaim for Unpaid Invoices**

As previously noted herein, Campbell asserts claims against Austin based on

tortious interference with contracts and breach of contract, and Austin counterclaims for unpaid invoices.  However, in light of the fact that no federal claims remain in this case, this Court need not retain jurisdiction over these state law claims.  Rocco v. N.Y.S. Teamsters Conference Pension & Ret. Fund, 281 F.3d 62, 72 (2d Cir. 2002).

It is well settled that the decision to exercise supplemental jurisdiction is vested in the sound discretion of the district court.  See Grace v. Rosenstock, 228 F.3d 40, 55 (2d Cir. 2000).  The Second Circuit has advised that district courts should typically decline to exercise jurisdiction over state law claims where all federal claims have been eliminated before trial.  See Travelers Ins. Co. v. Keeling, 996 F.2d 1485, 1490 (2d Cir. 1993); see also Martz v. Incorporated Vill. of Valley Stream, 22 F.3d 26, 32 (2d Cir. 1994) ("Having dismissed all of [the] federal claims, the district court was correct in also dismissing [the] pendent state law claims.").

By the plain language of the Agreement, the rights and obligations of the parties thereunder are governed by and must be construed under  New York State law.  (Domon Aff., Ex. A, ¶ 8(c)).  As such, Plaintiff's  remaining claims relating to tortious interference and breach of contract, and Defendant's counterclaim for unpaid invoices, necessarily involve an analysis of the Agreement under New York law.  Having dismissed all of the federal claims, this Court finds that these remaining issues are best left to the state courts.  Accordingly, Plaintiff's state law claims and Defendant's counterclaim will be dismissed without prejudice.  See Burgos v. City of Rochester, No. 99-CV-6480, 2003 WL 22956907, at *6 (W.D.N.Y. Mar. 31, 2003) (citing Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001)); United Mine Workers v. Gibbs, 383 U.S. 715, 726 n.15, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)).

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. Further, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and Defendant's state law counterclaim.  Accordingly, those claims are dismissed without prejudice.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 37) is GRANTED.

FURTHER, that Plaintiff's state law causes of action and Defendant's counterclaim are dismissed without prejudice.

FURTHER, that the Clerk of the Court is directed to take the steps necessary to close this case.

SO ORDERED.


Dated:          September 29, 2005
                Buffalo, New York                         /s/William M. Skretny
                                                        WILLIAM M. SKRETNY
                                                     United States District Judge